This appeal brings up a judgment of the Monmouth County Court, in a workmen's compensation case, which judgment affirmed an award of compensation by the Bureau to the plaintiff.
Respondent is the widow of Frank L. Irons, who died on April 4, 1946, while admittedly in the employ of appellant as a painter. Respondent filed a petition for compensation, alleging that her husband's death was due to an injury arising out of and in the course of his said employment. Appellant denied that the death was causally related to his employment.
It is claimed by respondent that, on April 4, 1946, the decedent while working as a painter at the Brisbane Estate in Allaire, New Jersey, suffered a heart attack and died immediately. Decedent's son testified that he was the foreman painter on the job and that his father was under his supervision; that on the day in question, decedent drove his automobile from their home to the place of employment, and that the son was a passenger therein; that decedent started work about eight o'clock; that by direction of the son there were two closets to be painted by decedent; that decedent finished painting one closet about nine o'clock and started on the *Page 218 
second closet, and while painting it the fatal heart attack occurred at about 9:20 in the morning. The son testified that each closet was about six feet high and about two and one-half feet deep, and about three feet wide. He further testified that the painting of the top of the closet was "an unusually hard job in the position he had to do it. We had no ladder and he had to work off a saw-horse. It was very straining work." He testified further that the saw-horse "was about 2 1/2 feet high, about 3 feet wide and the width of the standing part — that is, the part upon which he stood, was about 4 inches." He further testified that he saw his father from time to time, from the adjoining room, when he was working, and about 9:20 heard a thud and ran in the room to find his father "alongside the saw-horse and I ran in and grabbed hold of him and pulled him over near the window. He was all white and gasping for breath." He said it was straining work that decedent was doing. In answer to the question: "Why was it straining work on April 4th?" he said "Any person who has to work off a saw-horse knows it. He is too high to do the work underneath without bending in an awkward, strained position and if he doesn't use the saw-horse is too low for the upper work and so would have to be continually getting on and off the saw-horse. You have to see where you are painting and if you can't see it you can't paint it and that's why it is such a strain doing this kind of work." The witness testified that he had looked at his father ten minutes before he heard the thud. He afterward changed his testimony to about "two seconds, it may have been as much as five seconds."
Assuming that the doubtful testimony of the son indicates that decedent was subjected to some strain, we are confronted with the question whether such strain produced his death.
It is undenied that decedent was suffering from a heart condition. Dr. Vaccaro, decedent's physician, testified that he examined him on October 18, 1945, and that he "was suffering from coronary arteriosclerosis or coronary heart disease and angina pectoris;" that he prescribed for him and treated him on several occasions until February 2, 1946; that *Page 219 
he recommended that a cardiograph be taken and referred decedent to Dr. Albright, who took it and reported back to the witness his findings with the tracing, and that the witness used same in reaching his diagnosis of decedent's condition.
Dr. Vaccaro did not testify as to any relationship between decedent's work and his death. In answer to a question on cross-examination:
"Q. Doctor, could a man of this man's physical condition as you found him at the time of your examination, drop dead from a coronary disease?
"A. My answer is yes."
Respondent called a Dr. Bernstein, who had not seen decedent and was asked an hypothetical question which included:
"The date of the electrocardiograph is January 26, 1946, and the opinion given by Doctor Albright on the report is as follows:
"`This person shows a definite or definite evidence of a severe grade of myocardial damage. There are no findings which are particularly suggestive of recent myocardial infarction. However, some of the changes noted above could represent residual evidence of an old anterior wall infarction. It seems highly probable that the myocardial damage referred to above is an extensive and diffuse fibrosis of the myocardium on an etiologic background of generalized vascular disease with chronic coronary sclerosis and an inadequate coronary circulation. This type of tracing is frequently seen in cases of coronary insufficiency with angina pectoris.'" And, also, the following:
"There is testimony in the record by his son, Earl, of the work that he was doing on April 4, 1946, as being strenuous work and harder because he had to stand on a saw-horse two and half feet off the floor and balance himself with a paint bucket in one hand and a brush in the other hand and bent over the top of the closet in order to paint the top of the closet and that he was in an unusual position, as the witness described it when he was testifying."
His answer to the whole question was that his heart condition was such that the work "caused a greater demand on the coronary circulation of the heart than it could supply due to the arteriosclerosis which was present, and this relative coronary insufficiency at that time was great enough to produce a myocardial infarction to an extent when death ultimately resulted because of this effort." *Page 220 
On cross-examination the following occurred:
"Q. Now, doctor, from that report," referring to Dr. Albright's report, "as a specialist, would you not say that this man was in a precarious physical condition? A. Yes, he was.
"Q. Irrespective of any work that he may have been doing? A. Definitely.
"Q. And from that condition, doctor, would it be surprising if the man dropped dead from the coronary thrombosis irrespective of any effort that he might have sustained or indulged in? A. Yes, he could have."
Three medical witnesses testified for appellant. First was Dr. Albright, who made the report to Dr. Vaccaro, in January, 1946. He was asked the same hypothetical question as was propounded to the former witness, and, in answer thereto, said:
"In my opinion there is no causal connection between the work he was doing on that morning and his death."
He further testified:
"I saw this decedent in January, at which time he was obviously a sick man. He had evidence of extensive coronary arteriosclerosis. He had evidence if a severe grade of damage to his myocardium and by any criteria, he was a doomed individual. His life expectancy certainly was very limited. In a question of this type, I feel certain that one must deal in reasonable probabilities, and in my opinion, this man's final episode in his life, which was undoubtedly cardiac desisture * * * The final episode undoubtedly was cardiac failure. It is my opinion that this occurred spontaneously, without any direct relationship to the particular work or activity or lack of activity that he might have indulged in at that particular time. In my opinion this would have happened anywhere that he might have been or during the course of anything he might have been doing."
Appellant called a Dr. Busch and a Dr. Yaguda, both specialists, who expressed the same opinion as Dr. Albright, that the work of decedent on the morning in question has no causal relationship to his death.
It appears from the testimony, even giving credit to the somewhat contradictory testimony of the decedent's son, which is not in all respects convincing, that he was foreman of the *Page 221 
painters, that he employed his father, that he was not aware of his father's condition, although it existed for months before his death, that he gave him, at 74 years of age, "straining work." The burden of proving that decedent's death was the result of an accident arising out of his employment was not borne by respondent.
 As was said in Gaudette v. Miller et al., 1 N.J. Super. 145, 62 A.2d 749 (App. Div. 1948):
"The leading case dealing with cardiac failure is Lohndorf v.Peper Bros. Paint Co., 134 N.J.L. 156, 46 A.2d 439, 441
(Sup. Ct. 1946); affirmed 135 N.J.L. 352, 52 A.2d 61 (E. A. 1947). Mr. Justice Oliphant for the Supreme Court after pointing out the presumption that any death from heart disease is the result of natural causes, said: `An accident is "an unlooked for mishap or untoward event which is not expected or designed."Geltman v. Reliable Linen Supply Co., 128 N.J.L. 433,25 A.2d 894, 139 A.L.R. 1465, "an unintended or unexpected occurrence," Bollinger v. Wagaraw Building Supply Co.,122 N.J.L. 512, 6 A.2d 396, 401; it is an event happening at a specific time or occasion. Liondale Bleach, Dye Paint Works v.Riker, 85 N.J.L. 426, 89 A. 929. The words "accident" and "employment" are not synonymous. To render an injury compensable there must be an event or happening, beyond the mere employment itself, which brings about the final result or contributes thereto, and without which the injury or death would not have resulted.'"
See also Grassgreen v. Ridgeley Sportswear Mfg. Co.,2 N.J. Super. 62, 64 A.2d 616 (App. Div. 1949).
A weighing of all of the testimony in this case forces the conclusion that there was no event or happening, beyond the employment itself, which brought about the coronary thrombosis that resulted in decedent's death.
The judgment under review is reversed. *Page 222